UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL R. GREEN,<br><br>  Plaintiff,<br><br>  v.<br><br>HEATHER SHIRLEY, et al.,<br><br>  Defendants. | No. 1:23-cv-00505-JLT-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT (1) PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT BE DENIED; AND (2) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED<br><br>(ECF Nos. 47, 52)<br><br>OBJECTIONS, IF ANY, DUE WITHIN THIRTY (30) DAYS |

**I.    INTRODUCTION**

Plaintiff Michael R. Green is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983.  This case proceeds on Plaintiff's Eighth Amendment conditions of confinements claim against Defendant Shirley, Cronjager, and DeGough, stemming from Plaintiff's allegations that the levels of trichloropropane ("TCP") in the water at Wasco State Prison ("WSP") were unsafe for consumption.

On January 13, 2025, Plaintiff filed a "Partial Motion for Summary Judgment," in which he moved for summary judgment "on the issue only regarding violations of Wasco State Prison Drinking Water from 2020 to 2023."  (ECF No. 47).

On May 2, 2025, Defendants filed a motion for summary judgment and opposition to Plaintiff's motion for summary judgment.  (ECF No. 52).

1

For the following reasons, the Court will recommend that Plaintiff's motion for partial summary judgment (ECF No. 47) be denied, and Defendants' motion for summary judgment (ECF No. 52) be granted.

## II.     PLAINTIFF'S COMPLAINT

Plaintiff filed his complaint on April 25, 2023.  (ECF No. 7).  Plaintiff alleges as follows:

Defendant Scott Degough, the acting Water Contractor at Wasco State Prison, relayed false information to Wasco State Prison staff.  He hid the danger of the contaminated carcinogenic water filled with 1, 2, 3, trichloropropane ("TCP").  Defendant Degough failed to monitor the true risks of the dangerous toxin and failed to tell his superiors about the risk of stomach ailments and the risk of cancer.

Defendant J. Cronjager, the Head of Health and Safety, has a sworn duty to always second guess, investigate, and make sure that the water is not toxic and infested with chemicals that kill.

Defendant H. Shirley, the Warden of Wasco State Prison, is the overseer of the prison's wellbeing.  Defendant Shirley did not implement a productive plan to remedy the bad water situation.  Defendant Shirley outlawed bottled water for sale as an alternative to drinking the toxic water.

Plaintiff is forced to drink toxic water in order to take medication, which is damaging his esophagus, liver, and stomach.  The toxic water is also causing blurry vision.  Shafter, Wasco City, and Wasco State Prison drink water from Well #1 and Well #2.  Defendant Shirley and Defendant Cronjager work and possibly live in Kern County.  Additionally, Plaintiff knows that Defendants knew about, and continue to know about, the toxic water at Wasco State Prison because of constant news stories, magazine articles, and newspapers reporting on the failed water in Kern County.  The city of Shafter was told not to drink any of the water.

Prison staff knows that Wasco State Prison has been failing a federal standard for TCP for years now. Wasco State Prison set a three-year date from December of 2017 to fix the problem.  However, five plus years later, the problem still exists and is getting worse.  Defendants have exhibited actions that put Plaintiff's life in danger.  Plaintiff's right to clear drinking water has been violated.

On July 7, 2023, the Court screened the complaint and found that "Plaintiff's Eighth

2

Amendment conditions of confinement claims against defendants Shirley, Cronjager, and Degough should proceed past screening." (ECF No. 9 at 7).

### III. THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

#### A. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for "partial" summary judgment "on the issue only regarding violations of Wasco State Prison Drinking Water from 2020 to 2023." (ECF No. 47). Plaintiff argues that Defendants DeGough and Shirley disregarded the rules and regulations for safe drinking water by failing to reduce the Maximum Contaminate Levels ("MCL") for trichloropropane ("TCP"), an industrial cleaning and degreasing solvent, down to 0.000005 ug/L. (ECF No. 47 at 1-2). Plaintiff alleges that Defendants DeGough, Shirley, and Cronjager failed to fix the violations, and knowingly and intentionally exposed Plaintiff to this toxicity of 1, 2, 3 TCP chemicals. (*Id.* at 1). Plaintiff further alleges that Defendants failed to set safe levels for TCP that corresponded with the public health and safety goal. (*Id.*).

In support of his motion, Plaintiff attaches various documents indicating that the levels of TCP in ESP's water exceeded the regulatory limits and that WSP attempted to build a filtration system for the water. Plaintiff also attached his own responses to Defendants' interrogatories indicating Plaintiff's belief that the water had harmed his health. He also attached various news articles critical of prison health care generally. (ECF No. 47 at 8-34).

#### B. Defendants' Opposition and Cross-Motion for Summary Judgment

On May 2, 2025, Defendants filed a cross motion for summary judgment, which also serves as an opposition to Plaintiff's motion for partial summary judgment. (ECF No. 52).

Defendants argue that (1) "Wasco State Prison's water was safe to drink;" (2) "TCP did not cause any of [Plaintiff's] medical conditions;" and (3) "Wasco State Prison is constructing a filtration system to remove TCP from Wasco State Prison's water;" (4) and Defendants' involvement and responsibility in responding to Wasco State Prison's TCP levels did not cause Plaintiff harm. (ECF No. 52-1 at 7-12). Defendants also argue that they are entitled to qualified immunity. (ECF No. 52-1 at 18-20).

Defendants state that there is "no medical record of [Plaintiff's] alleged effects of liver

3

1  pain, kidney damage, stomach irritation, hormonal imbalance, and lymphocyte overproduction at the time of or following the alleged exposure." (ECF No. 52-1 at 9).  Defendants also argue that their medical expert found that "[Plaintiff's] exposure to TCP between November 2020, and September 2023, would not be expected to have even a minimal risk of harmful effects during his lifetime." (*Id.* (citing DUF 27)).  Defendants further argue that "[t]here is no evidence that [Plaintiff] ingested or was exposed to toxic or harmful doses of TCP from any source." (*Id.*).

In support of their argument, Defendants attached (1) a declaration of California Deputy Attorney General Mohammad Iranmanesh, which contains a list of bed assignments for WSP and Plaintiff's deposition (ECF No. 52-2); (2) a declaration of medical expert Timur S. Durrani, M.D., M.P.H., (ECF No. 52-3); (3) a declaration of former warden J. Cronjager (ECF No. 52-4); (4) a declaration of correctional plant manager S. DeGough (ECF No. 52-5); (5) a declaration of former acting warden H. Shirley (ECF No. 52-6); (6) a separate statement of undisputed facts in support of Defendants' motion for summary judgment (ECF No. 52-7); and (7) a "Rand" warning to Plaintiff (ECF No. 52-8).

**C. Plaintiff's Reply and Opposition to Defendants' Summary Judgment**

In his reply in support of his motion for summary judgment, Plaintiff argues that the Court should grant his motion for partial summary judgment because of the relationship between his exposure to TCP and health risks. (ECF No. 57 at 1).

Plaintiff objects to Defendants' medical expert, Dr. Durrani, as "nonresponsive" to his concerns about the dangerous levels of TCP. (*Id.*).  Additionally, Plaintiff moves to have Defendants' expert witness excluded pursuant to *Daubert v. Merrill Dow Pharms, Inc.*, 509 U.S. 579 (1993). (*Id.*).

Plaintiff states that "there is reliable medical and scientific 'Data' which conforms [sic] that it is more likely than not that person will develop cancer as a result of exposure to 1,2,3 sensitive (TCP)[.]" (*Id.* at 2).

Plaintiff further states that Defendant DeGough was well aware of the TCP problem in the drinking water at WSP. (*Id.* at 4).  Plaintiff also argues that Defendants did not warn inmates about the health risks of the water, and overlooked implementing proper technology to address the water contamination issue. (*Id.* at 5).  Plaintiff argues that Defendants H. Shirley and J.

4

Cronjager had a decade-long history of violating the drinking water regulation and breached their fiduciary duties to inmates. (*Id.* at 7-8). Plaintiff also argues that pursuant to California Proposition 65, there is a duty to warn him of the presence of toxins. (*Id.* at 10).

**D. Defendants' Reply in Support of Their Motion for Summary Judgment**

In their reply in support of their motion for summary judgment, Defendants argue that Plaintiff fails to provide admissible evidence to establish a genuine dispute of material fact regarding his Eighth Amendment claim. (ECF No. 62 at 2). Specifically, Plaintiff offers no competent evidence that the water at WSP posed a substantial risk of serious harm to him. Defendants argue that Plaintiff's materials—including AI-generated content about TCP, PowerPoint slides, and medical forms—are inadmissible under the Federal Rules of Evidence due to lack of authentication, hearsay, irrelevance, and improper lay opinion. Defendants also argue that Plaintiff's claims about interactions between TCP and his medications are speculative and unsupported by any expert testimony. Furthermore, Defendants argue that Plaintiff fails to offer any evidence that they knew of and disregarded a serious risk to his health, or that their response was inadequate.

Finally, Defendants argue that Plaintiff's objections to Defendants' expert, Dr. Durrani, lack merit because Dr. Durrani is a qualified toxicologist who based his opinion on Plaintiff's medical records, deposition, and official water quality reports. Defendants state that the expert analysis concludes that Plaintiff was not exposed to a harmful level of TCP. Defendants argue further that Plaintiff offers no authority or evidence showing Dr. Durrani's opinion is unreliable under Federal Rule of Evidence 702.

**IV.   LEGAL STANDARDS**

**A. Motion for Summary Judgment**

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

5

> stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial," which is not a light burden, the party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the Court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026,

6

1031 (9th Cir. 2001).

### B. Conditions of Confinement

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which [the prisoner] is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Conditions of confinement may, consistent with the Constitution, be restrictive and harsh. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Prison officials must, however, provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995); *see also Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

Two requirements must be met to show an Eighth Amendment violation for unconstitutional conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, sufficiently serious." *Id.* (citation and internal quotation marks omitted). And where this is an allegation concerning "a failure to prevent harm, the inmate must show that he [was] incarcerated under conditions posing a substantial risk of serious harm." *Id.*

Second, "a prison official must have a sufficiently culpable state of mind," which for conditions of confinement claims "is one of deliberate indifference." *Id.* (citations and internal quotation marks omitted). Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety. *Id.* at 837. The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim. *Johnson,* 217 F.3d at 731. Mere negligence on the part of a prison official is not sufficient to establish liability, but rather, the official's conduct must have been wanton. *Farmer*, 511 U.S. at 835; *Frost v. Agnos,* 152 F.3d 1124, 1128 (9th Cir. 1998).

### V. ANALYSIS

In light of Defendants' considerable evidence that the water at WSP during the relevant time was safe to drink, the Court addresses whether there is a genuine dispute of fact as to

1  whether the conditions, i.e., the water at WSP, posed a substantial risk of serious harm as required
2  for an Eighth Amendment claim for unconstitutional conditions of confinement.

### A. Defendants' Evidence Regarding Lack of Substantial Risk of Serious Harm

The Court begins by evaluating the evidence Defendants have submitted on this issue in their motion for summary judgment and opposition to Plaintiff's motion for summary judgment.

Defendants' Statement of Facts, citing to and supported by evidence, states as follows: Plaintiff arrived at WSP in November 2020 and was housed there until September 2023. (*Id.* at 1). During the time that Plaintiff was incarcerated at WSP, the water was tested and notices from the independent laboratory's findings were posted quarterly at the institution. The tests revealed TCP level results that ranged from 0.000 ug/L to 0.024 ug/L. (*Id.* at 3).[1] Notices reporting the independent laboratory's findings regarding the levels of TCP in Wasco State Prison's water were posted quarterly throughout Wasco State Prison in compliance with California regulations. (*Id.*). The quarterly notices stated that the TCP levels did not present an emergency and that inmates did not need to use an alternative source of water, like bottled water. (*Id.*). Rather, they indicated that "'some people who drink water containing 1, 2, 3-trichloropropane in excess of the MCL over many years may have an increased risk of getting cancer,' and encouraged those concerned about other health issues to consult a doctor." (*Id.*).

Defendants also submit the declaration of Defendants' medical expert, Timur Durrani. Dr. Durrani is a M.D., M.P.H.,[2] who serves as the Medical Director for Occupational Health Services at the Zuckerberg San Francisco General Hospital and Trauma Center ("ZSFG"). (ECF No. 52-3 at 1). Dr. Durrani also serves as a Medical Toxicology consultant for the Agency for Toxic Substances and Disease Registry, region 9, the Environmental Protection Agency, region 9, and the Western States Pediatric Environmental Health Specialty Unit ("PEHSU"). (*Id.* at 2). Dr. Durrani has other credentials such as serving as the Assistant Medical Director for the San

---

[1] Where the information regarding TCP testing is provided in Defendants' statement of undisputed facts, it appears that Defendants inadvertently typed 2022 as the year that Plaintiff arrived at WSP. (*See* ECF No. 52-7). Notably, in that same section, Defendants say the testing began in December 2020, and elsewhere in the brief, Defendants indicate that Plaintiff arrived at WSP in 2020. (*See Id.*; *see also* ECF No. 52-7 at 1).

[2] M.P.H. stands for Master of Public Health.

Francisco Division of Poison System, the Faculty of Record for the course Medicine 180, Occupational Toxicology, taught in the Winter quarter at UCSF, and the instructor in Medicine 140.43, Clinical Toxicology and Pharmacology, taught year-round at UCSF. (ECF No. 52-3 at 2). Dr. Durrani is also a member of multiple professional organizations, including the American College of Medical Toxicology. Additionally, Dr. Durrani is the past President of the California Academy of Preventative Medicine and has been on numerous committees and panels related to occupational and environmental medicine and toxicology. (*Id.* at 3).

Dr. Durrani reviewed Plaintiff's complaint, a transcript of Plaintiff's November 27, 2024, deposition, Plaintiff's CDCR medical records from January 1, 2015, through August 2024, WSP's quarterly drinking water notices and annual consumer reports from December 2020 to September 2023. (*Id.* at 4).

On the question of whether the water at WSP posed a substantial risk of serious harm to Plaintiff, Dr. Durrani states, under penalty of perjury:

> Based on my review of Wasco State Prison's quarterly water notices, I am aware that Wasco State Prison cited concentrations of 0.006 µg/L and 0.021 µg/L between November 2020 and September 2023.
>
> TCP is a man-made chlorinated hydrocarbon that is typically used as an industrial solvent and as a cleaning and degreasing agent. It is a colorless liquid with an odor similar to chloroform. TCP in pure form is likely to exist as a dense, nonaqueous phase liquid and, thus, will sink to the bottom of a groundwater aquifer because its density is greater than that of water.
>
> In 1992, TCP was added to the list of chemicals known to the State of California to cause cancer under California's Safe Drinking Water and Toxic Enforcement Act. In 1999, the California State Water Quality Control Board established a 0.005 µg/L drinking water notification level for TCP. This level was based on cancer risks derived from laboratory animal studies as reviewed by the U.S. Environmental Protection Agency (EPA). It is reasonably anticipated to be a human carcinogen per the U.S. National Toxicology Program. The International Agency for Research on Cancer (IARC) has also classified TCP as probably carcinogenic to humans based on sufficient evidence of carcinogenicity in experimental animals. There have not been any human studies evaluating the risk of TCP and cancer, and there is no claim of cancer by Green.
>
> According to data in the scientific literature, three articles reported acute medical conditions in humans, which described a total of four people who were exposed to TCP. The first case involved a 20-year-old male college student majoring in chemical engineering from a northwest city in China working in a nonventilated

9

environment with industrial paint with a pungent smell for one hour without personal protective equipment (PPE). The second case involved an 18-year-old male worker from a village in central China exposed to an industrial paint environment with a pungent smell for 8 hours a day without PPE for three days. Both cases resulted in a severe liver injury requiring hospitalization, but they fully recovered. The third case was a worker who had been painting internal walls for six days in confined spaces for up to eight hours at a time. He was hospitalized and diagnosed with acute toxic leukoencephalopathy, a neurological disorder that damages the brain's white matter. His injuries were attributed to TCP in the manufacture of paints. His blood TCP level was 7.6 ng/mL. After intensive treatment and care, he recovered. The fourth person exposed to TCP was a farmer who initially presented to a local hospital in Bao-ding City, Hebei Province, after ingesting 10-15 mL of liquid as a bet 27 hours earlier. He developed fulminant liver failure. His blood level of TCP was 7500 μg/L. He left the hospital with his family before definitive treatment could be provided and was lost to follow-up.

In 1999, the California State Water Quality Control Board established a 0.005-micrograms per liter (μg/L) drinking water notification level for TCP. This value was based on cancer risks derived from laboratory animal studies as reviewed by the US Environmental Protection Agency (USEPA, 2017). It is reasonably anticipated to be a human carcinogen per the US National Toxicology Program ((NTP), 2021). The International Agency for Research on Cancer (IARC). Has classified TCP as probably carcinogenic to humans based on sufficient evidence of carcinogenicity in experimental animals (IARC, 1995). In 1992, TCP was added to the list of chemicals known to the state to cause cancer under California's Safe Drinking Water and Toxic Enforcement Act (Board, 2024). Although tests in animals are the most common methods of identifying agents that cause toxicity, such as cancer, there is not a direct correlation between the types of cancers seen in animals and humans. Animal studies can be difficult to extrapolate to humans, given the disparity among life spans (18–24 months for rodents vs 75 years for humans). In addition, different animal strains and species may show qualitative and quantitative differences in the pattern or intensity of response to a toxic agent. There have not been any human studies evaluating the risk of TCP and cancer, and there is no claim of cancer by Green.

There is also one human study evaluating the relationship between maternal residential proximity to industrial air releases of chlorinated solvents, including TCP. Neural tube defects in the offspring of 41 case mothers and 2847 control mothers were followed. The researchers found a statistically significant increase in neural tube defects in children born to mothers who had residential proximity to air emissions of chlorinated solvents, including TCP. These outcomes only affect infants of pregnant women.

There is no federal maximum contaminant level (MCL) for TCP in drinking water, but the Environmental Protection Agency requires many large water utilities to monitor for TCP with a minimum reporting level of 0.03 μg/L. Some states have established their own MCLs. For example, Hawaii established a state MCL of 0.6 μg/L. In December 2017, a California regulation established an MCL of 0.005

μg/L. The regulation went into effect on January 1, 2018. The regulation also required all water systems in California to conduct quarterly monitoring for TCP in water sources.

Although Wasco State Prison's water contained TCP concentrations above the MCL, acute and chronic medical conditions are not expected to occur for Green from exposure to TCP in Wasco State Prison's water from November, 2020 to September, 2023, at levels of those reported at Wasco State Prison. There are no reports of acute or chronic medical conditions in the scientific literature for a 34-month exposure to the concentration of TCP reported in the water at Wasco State Prison.

Green's daily ingestion of TCP can be estimated using the Drinking Water Ingestion Exposure Dose Formula as described in the Public Health Assessment Guidance Manual (PHAGM) from the Agency for Toxic Substances and Disease Registry, a federal public health agency of the U.S. Department of Health and Human Services. Based on my review of Green's deposition transcript, it is my understanding that while incarcerated at Wasco State Prison, Green consumed 1.5 gallon of water per day, which converts to 5.6 liters per day. Based on my review of Green's medical records, it is my understanding that in 2020, his body weight was reported at 123.9 kg. Using the highest TCP level reported at Wasco State Prison during the relevant time period (0.021 μg/L), a daily intake rate of 5.6 liters per day, an exposure factor of 1, as he had daily, chronic exposure, and a body weight of 123.9 kg, Green's maximum daily TCP dose during the relevant time period was 0.00000105 mg/kg/day.

According to the EPA, the Reference Dose for TCP is 0.004 mg/kg/day. The Reference Dose is an estimate of daily oral exposure for a chronic duration (up to a lifetime) to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime. Because Green's daily, chronic exposure dose of 0.00000105 mg/kg/day is significantly lower than the EPA's Reference Dose of 0.004 mg/kg/day, Green's exposure to TCP between November, 2020, and September, 2023, would not be expected to have even a minimal risk of harmful effects during his lifetime.

The EPA's most specific definition of chronic exposure is "Repeated exposure by the oral, dermal, or inhalation route for more than approximately 10% of the life span in humans." Green's exposure does not meet the EPA's definition of chronic exposure because his exposure duration lasted only 27 months.

Similarly, Green's alleged effects do not meet the most specific EPA definition of chronic effect, defined as "the effect of a stimulus that lingers or continues for a relatively long period, often one-tenth of the life span or more." Because Green's exposure duration lasted only 34 months, and he is 58 years old, Green's alleged effects do not meet this definition.

Green's alleged effects of skin deformant (sic), liver pain, kidney damage, stomach irritation, hormonal imbalance, and lymphocyte overproduction are not

> consistent with published scientific literature on TCP exposure.
>
> After his alleged exposure, he was noted to have left inguinal hernia repair and had pain after the surgery. There is no medical record of Mr. Green's alleged effects of skin deformant (sic), liver pain, kidney damage, stomach irritation, hormonal imbalance, and lymphocyte overproduction at the time of or following the alleged exposure.
>
> Accordingly, the evidence does not support Mr. Green's claimed skin deformant (sic), liver pain, kidney damage, stomach irritation, hormonal imbalance, and lymphocyte overproduction as being caused by exposure to TCP in Wasco State Prison.

(*Id.* at 4-8 (internal numbering and footnotes omitted)).

Defendants also provide a declaration from Defendant J. Cronjager, retired Associate Warden from Wasco State Prison. (ECF No. 52-4). Defendant J. Cronjager served in that role from 2013 until retiring in December 2021, and supervised plant operations. (*Id.* at 1). Defendant J. Cronjager states that beginning in January 2018, a California regulation required quarterly testing of 1,2,3-TCP in drinking water, and Wasco's water was tested and monitored accordingly. (*Id.* at 2). Although test results showed levels above the maximum contaminant level, notices were posted indicating there was no emergency and no need for alternative water sources. (*Id.*).

As additional evidence, Defendants provide a declaration from Defendant S. DeGough, the Correctional Plant Manager II at Wasco State Prison. (ECF No. 52-5). Defendant S. DeGough states that at all relevant times, the prison's water came from two wells supplying both inmates and staff. (*Id.* at 1). Defendant S. DeGough acknowledges a 2018 California regulation setting a strict limit on 1,2,3-TCP levels in drinking water and confirms that Wasco conducted quarterly testing as required. (*Id.* at 2). TCP levels between July 2021 and September 2023 (during inmate Plaintiff's incarceration) exceeded the limit but were not deemed an emergency. (*Id.* at 2-3). Defendant S. DeGough oversaw water records and posted state-mandated notices informing inmates that while the water was non-compliant, it was not dangerous, and no alternative water source was needed. (*Id.*).

The final declaration provided is from Defendant H. Shirley, a former Warden at Wasco

State Prison. (ECF No. 52-6). Defendant H. Shirley was generally aware that drinking water came from wells shared by staff and inmates. (*Id.*).

Upon review, the Court concludes that Defendants have presented sufficient evidence showing that, while the TCP levels at times exceeded California's maximum contaminant level (MCL), they did not pose a substantial risk of serious harm to Plaintiff. Most notably, Defendants have presented the expert opinion of Dr. Durrani, who opines that that although Wasco State Prison's water contained TCP above the state regulatory limit, Plaintiff's estimated exposure was far below levels associated with health risks and did not meet the EPA's criteria for chronic exposure or chronic effect. Moreover, there is no medical or scientific evidence linking Plaintiff's alleged symptoms to TCP exposure.

Based on this evidence, the Court concludes that Defendants have met their burden of presenting sufficient evidence to show an absence of genuine issue of material fact as to whether the WSP water posed a substantial risk of serious harm to Plaintiff.

### B. Plaintiff's Evidence Regarding Substantial Risk of Serious Harm

The Court next evaluates the evidence Plaintiff has presented to determine whether he has come forth with evidence from which a jury could reasonably render a verdict in his favor on the question of whether the WSP water posed a substantial risk of serious harm.

#### 1. Plaintiff's Evidence in Support of his Motion for Summary Judgment and Opposition

The Court begins with the evidence that Plaintiff provided in support of his Motion for Partial Summary Judgment.

In support of his motion, Plaintiff attaches (1) a "Capital Outlay Concept Paper" which seems to describe the cost for implementing the new carbon filtration system at WSP; (2) a Quarterly Progress Report from April 15, 2020, signed by Defendant DeGough, which describes that both wells exceeded the MCL for the quarter; (3) a Quarterly Progress Report from January 20, 2021, signed by Defendant DeGough, which describes that both wells exceeded the MCL for the quarter; (4) a Quarterly Progress Report from November 9, 2021, signed by Defendant DeGough, which describes that both wells exceeded the MCL for the quarter and that CDCR had

awarded a construction bid for the GAC unit installation to remove 1, 2, 3 TCP from the drinking water facility at WSP; (5) a Quarterly Progress Report from August 3, 2022, which describes that both wells exceeded MCL for the quarter and that the construction for the GAC unit had begun on June 1, 2022; (6) a Quarterly Progress Report from February 8, 2023, signed by Defendant DeGough, which describes that both wells exceeded the MCL for the quarter and that the land was surveyed and the underground facility was located; (7) a Quarterly Progress Report from July 24, 2023, signed by Defendant DeGough, which describes both wells exceeded the MCL for the quarter and that the work on the well was scheduled for fulfillment in August 2023; (8) a document entitled "Safety Data Sheet" that describes attributes and physical qualities of 1, 2, 3-Trichloropropane; (9) pages of handwritten interrogatories and responses; (10) a July 6, 2006, Los Angeles Times article entitled "Inmate Care Is a Mess, Official Says * The state prison health care system is wasteful, dysfunctional, dangerous and will defy any quick fix, a federal receiver's report says;" (11) a May 11, 2005, Los Angeles Times article entitled "Healthcare in Prisons 'Shocking' * Problems in the state's medical treatment of inmates prompt a federal judge to consider appointing a receiver to manage the system;" (12) a September 29, 2004, Los Angeles Times "Prisons Fail to Heal Healthcare * Disclosures of doctors' spotty backgrounds point to a state system still in crisis a lawmaker declares. A hearing is scheduled for today;" (13) handwritten interrogatories, without written answers from Defendants, dated November 19, 2024; (14) and a handwritten document entitled proof of service. (ECF No. 47 at 8-34).

The Court finds that these documents do not raise a genuine dispute of fact on the issue of whether the WSP water posed a substantial risk of serious harm. They do not include any reliable, authenticated evidence that the water caused any risk of harm, including to Plaintiff.

Most of the evidence Plaintiff has presented concern the levels of TCP in the water at WSP exceeding the amount set by California regulations. Specifically, the regular Quarterly Progress Reports, itemized as (2)-(7) above, indicate that both wells exceeded the MCL for the quarter. However, this evidence does not establish that levels of TCP in the water at the relevant time posed a substantial risk of serious harm. Defendants' motion for summary judgment concedes that the TCP levels exceeded California's standards, but provides substantial evidence,

14

1   including expert opinion, that the amounts of TCP in the water did not pose a substantial risk of
2   serious harm to Plaintiff.  Plaintiff's evidence does not say otherwise.

3   Plaintiff also includes several older Los Angelos Times articles from 2004, 2005, and
4   2006, which discuss the poor healthcare treatment provided to prisoners.  However, this evidence
5   substantially predates the period in question and does not concern any risk posed by the WSP
6   water.

7   Plaintiff has also submitted documents that he describes as Interrogatory Response to
8   Number #4, Response to Interrogatory #5, and Interrogatory Question Number #3.  Although
9   Plaintiff does not identify the documents, these appear to be his own responses to Defendants'
10  interrogatories. For example, Interrogatory No 4 is "Do you attribute any Physical, Mental, or
11  Emotional injuries to the incident."  The response states "Yes (1) causes imbalance of my
12  hormonal, (2) causes lymphocycltes over production," along with other physical impairments.
13  However, these documents merely show Plaintiff's own lay opinion that the water at WSP caused
14  him harm. However, Plaintiff is not an expert and may not give an opinion on the dangers posed
15  by the TCP levels in WSP's water.  Fed. R. Evid. 701 ("If a witness is not testifying as an expert,
16  testimony in the form of an opinion is limited to one that is (a) rationally based on the witness's
17  perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in
18  issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope
19  of Rule 702.").

20  Thus, the Court finds that Plaintiff's motion for summary judgment does not contain
21  sufficient evidence for a jury to reasonably render a verdict in his favor on the question of
22  whether the water at WSP posed a substantial risk of serious harm.

23  **2. Plaintiff's Filings in Response to Defendants' Motion for Summary**
24  **Judgment**

25  The Court next looks to the evidence Plaintiff submitted in opposition to Defendants'
26  motion for summary judgment.

27  In opposition to Defendants' motion for summary judgment, Plaintiff filed his own
28  declaration.  (ECF No. 58).  Plaintiff appears to argue that he may admit "lay person opinion and

15

belief" that Defendants violated this constitutional rights. He then describes various arguments he intends to present to the jury, including that "Wasco State Prison's water was not completely safe." (ECF No. 58, at p. 2). Attached to Plaintiff's declaration is a specification for a Murdock A171.8-UG Series water cooler. (ECF No. 58, at p. 6).

Plaintiff also filed another document entitled "Plaintiff's Reply to Defendants Separate Statements of Undisputed Facts; In Support of Plaintiff's Motion for Partial Summary Judgment," (ECF No. 59), which appears to be an 82-page argumentative response to Defendants' statement of undisputed facts, followed by 108 pages of documents. Those documents include (1) Plaintiff's health records (ECF No. 59 at 84-86); (3) a Document entitled "Drug Interactions between Furosemide and Trichloropropane" (ECF No.59 at 87-96); (4) an AI generated summary about the relationship between TCP and atorvastatin (ECF No. 59 at 97-99); (5) a Memorandum from August 22, 2018, with the subject line "2020/2021 Capital Outlay Concept Paper (ECF No. 59 at 101); (6) a Capital Outlay Concept Paper dated 2020-21, which provides the cost for the new carbon filter system (ECF No. 59 at 102-03); (7) a document entitled FY 2020/21 Capital Outlay Concept Papers which lists the costs for the new filtration system and the fire house addition (ECF No. 59 at 104); (8) a different AI generated summary about TCP (ECF No. 59 at 106-115); (9) an article from May 16, 2025, entitled "1,2,3 Trichloropropane Contamination in California Drinking Water (ECF No. 59 at 117-125); (10) a PowerPoint about the health effects of TCP (ECF No. 59 at 127-146); (11) medical consultation notes from Plaintiff's medical visits (ECF No. 59 at 148-153); (12) Plaintiff's Health Care Services Request Forms (ECF No. 59 at 154-168); (13) two isolation notices that appear to be from the COVID-19 pandemic era (ECF No. 59 at 171, 172); a safety data sheet about TCP (ECF No. 59 at 173-174); (14) quarterly progress reports and notices regarding the drinking water at WSP (ECF No. 59 at 176-185); (15) an itemized list of products and food available for purchase at WSP (ECF No. 59 at 187-189); and (16) a copy of what appears to be Plaintiff's medical prescription (ECF No. 59 at 191).

The Court also finds that these documents also do not raise a genuine dispute of fact on the issue of whether the WSP water posed a substantial risk of serious harm. As described above, Plaintiff's own lay opinion about the dangers posed by WSP's water, or TCP, is not admissible.

16

1  *Fed. R. Civ. P.* 701. The other exhibits Plaintiff has attached are not authenticated, and thus

2  cannot present a genuine issue of material fact on summary judgment. *Orr v. Bank of Am.*, 285

3  F.3d 764, 773 (9th Cir. 2002) (holding certain exhibits inadmissible due to inadequate

4  authentication or hearsay, and as a result finding they do not present a triable issue of material

5  fact). Moreover, they do not address the risk posed by WSP's water at the relevant time, or the

6  risks posed by the amounts of TCP consumed by Plaintiff.

### 3. Plaintiff's Challenge to Defendants' Expert, Dr. Durrani

8  Plaintiff's opposition also objects to Defendants' medical expert, Dr. Durrani, on the basis

9  that the expert was "nonresponsive to Plaintiff's concerns over the danager [sic] exposure of the

10  1, 2, 3, (TCP) and Plaintiff's medication, and additive effect of exposure to the contaminant in the

11  water being used in the food, and the degree to which these exposures may contribute to the

12  overall maximum daily [] ingestion of water per-day and over weight body burden of the

13  contaminant in the Wasco State Prisons. O[r] how these heightened levels effected within the

14  inmates [medications] and in the food being served to inmates." (ECF No. 57 at 1).

15  However, Plaintiff does not provide any admissible evidence that TCP posed a substantial

16  risk of serious harm to Plaintiff specifically due to his medication. Nor does Plaintiff demonstrate

17  that Dr. Durrani's calculations of Plaintiff's intake of water were unreasonable.

18  Plaintiff also moves to exclude Dr. Durrani as unreliable pursuant to *Daubert v. Merrell*

19  *Dow Pharms, Inc.,* 509 U.S. 579 (1993) and Federal Rule of Evidence 702. Plaintiff states "Here,

20  Plaintiff's Object, as to there is No real substantial factor testing verified evidence in the record

21  concerning toxicity present of 1, 2,3 TCP in humans." (ECF No. 57, at p. 10). However, as

22  described above, Dr. Durrani cited many bases for his conclusion that the water in WSP did not

23  pose a substantial risk of serious harm to Plaintiff, including that the studies of acute medical

24  conditions in humans were exposed to a far greater amount of TCP than present in WSP's water;

25  that "[t]here are no reports of acute or chronic medical conditions in the scientific literature for a

26  34-month exposure to the concentration of TCP reported in the water at Wasco State Prison," that

27  "Green's daily, chronic exposure dose of 0.00000105 mg/kg/day is significantly lower than the

28  EPA's Reference Dose of 0.004 mg/kg/day;" and that "Green's alleged effects of skin deformant

17

(sic), liver pain, kidney damage, stomach irritation, hormonal imbalance, and lymphocyte overproduction are not consistent with published scientific literature on TCP exposure." (ECF No. 52-3). Plaintiff thus does not provide a basis to exclude Dr. Durrani's expert opinion.

Moreover, Plaintiff does not present any expert opinion of his own on the subject of the harm posed by WSP's water. Plaintiff also lacks other admissible evidence, such as scientific journals, medical records, or statements from Defendants, showing that the TCP levels in WSP's water posed a substantial risk of serious harm, or that Plaintiff's health issues--liver pain, kidney damage, stomach irritation, hormonal imbalance, and lymphocytes—were caused by WSP's water.

Therefore, none of Plaintiff's evidence is sufficient to raise a genuine dispute of fact that the water at WSP posed a substantial risk of serious harm. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim against them based on unconstitutional conditions of confinement.[3]

## VI.   CONCLUSION AND RECOMMENDATIONS

For the above reasons, IT IS RECOMMENDED that:

1. Defendants' motion for summary judgment (ECF No. 52) be GRANTED;
2. Plaintiff's partial motion for summary judgment (ECF No. 47) be DENIED;
3. Judgment be entered in Defendants' favor, and that the Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any objections shall be limited to no more than fifteen (15) pages, including exhibits. Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file

---

[3] Because the Court finds that this issue is sufficient to resolve the parties' motions, it declines to address the other arguments raised by the parties including whether Defendants acted with deliberate indifference or are entitled to qualified immunity.

objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **October 1, 2025**              /s/ Erica P. Grosjean
                                       UNITED STATES MAGISTRATE JUDGE